## SMITH, ET UX. *v.* STATE ROADS COMMISSION OF MARYLAND

[Nos. 135 and 244, September Term, 1969.]

*Decided March 4, 1970.*

154

The cause was argued before HAMMOND, C. J., and McWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Charles Duvall Smith* and *Cary M. Euwer*, with whom were *Taylor, Euwer & Clagett* on the brief, for appellants.

*Carl Harrison Lehmann*, with whom were *Francis B. Burch, Attorney General*, and *Joseph D. Buscher, Special Assistant Attorney General*, on the brief, for appellee.

FINAN, J., delivered the opinion of the Court.

The unrelenting onslaught of highway construction has ravished two sand and gravel quarries which lay in the path of Interstate Highway I-95. The quarries, situated in close proximity to each other, had supplied material for road building and general construction in Prince George's County. The dissatisfaction of the owners of the quarries with the jury's awards in the two cases in which they were the subject of condemnation has given rise to this consolidated appeal.

The main ground for appeal is predicated on the actions of the lower court which, in determining the admissibility of testimony as to the fair market value of the property, excluded testimony before the jury as to the value of the mineral deposits separate and apart from the value of the land as a whole. The excluded testimony had sought to spell out in detail the unit price of the minerals in place multiplied by the quantity in order to arrive at their value. The appellant took further exception to the court's instructions to the jury wherein, following the

same rationale as used in excluding evidence, it refused to permit the jury to use the unit price in place times quantity formula in arriving at their award.

Case No. 135, referred to as the "Aitcheson" tract, involved the taking of 11.2 acres. There was testimony that 1,978,708 tons of usable sand and gravel were deposited within the limits of the right-of-way. The jury returned an award of damages in the amount of $67,504.

Case No. 244, referred to as the "Hutchinson" tract, contemplated the taking of 15 acres for the purpose of the right-of-way of I-95 which, in addition, would have caused a "landlocking" of the 36 acres remaining of the original tract, but for the provision that an access-way be provided by the State. There was testimony that 402,-105 tons of usable sand and gravel were lost by the taking. The jury awarded damages in the amount of $75,000.

The lower court following what it believed to be the reasoning of this Court in *State Roads v. Creswell*, 235 Md. 220, 201 A. 2d 328 (1964), gave the following instruction to the jury, substantially identical, in both cases:

> "You are instructed as a matter of law that you are not to attempt to compute the just compensation of this case by multiplying any figures for sand, gravel, or dirt testified to in this case by any value, price or profit per ton. The quantity and quality of such gravel can be considered by you only in relation to the value, if any, that the presence of such deposits contribute to the value of the land as a whole. In other words, you cannot and must not value the minerals in place by any method to arrive at a value for the land. However, if you feel that because the land has gravel upon it, it has a higher value than nearby land not adaptable for quarrying purposes, then you may consider such additional value in assessing damages in this case."

In *Creswell, supra,* Judge Marbury writing for the Court recognized the problem presented by the question of the evaluation of property containing mineral deposits and stated not only the view of the weight of authority, but what we think, and the lower court thought to be, the better principle of law to be applied in such instances. However, as will be noted in *Creswell,* the issue as to the use of the multiplication process in determining value, having not been properly preserved for determination on appeal, was not actually before the Court. The Court stated:

> "By far the most serious contention of the appellant concerns the proper method of determining valuation of condemned property when it contains mineral deposits. There is no disagreement with the general rule in this State. The measure of compensation is the actual market value of the property, which value depends upon the uses for which the property is available, and any special utility which may enhance its value in the market is an element to be considered. Where the suitability of a property for a particular use contributes to the market value, it can be considered even if it has not in fact been so utilized. *State Roads Comm. v. Warriner,* 211 Md. 480, 485, 128 A. 2d 248, and cases cited, especially *Bonaparte v. M. & C. C. of Balto.,* 131 Md. 80, 83, 101 Atl. 594.

> "Appellant argues that appellee has not shown that the presence of the gravel was relevant, i.e., that it added value to the land. It would seem simple to show valuation of the gravel by multiplying the total number of cubic yards of gravel by a unit value and thereby prove the value of the quantity of gravel to the land. However, the majority of cases do not permit this method, for the mineral deposit cannot be treated as a separate entity but must be considered an

integral part of the property. Thus while a jury, in deciding upon the damages to the condemnee, may consider what value the minerals add to the property, if any, it may not use the most obvious method of determining what that value is, a rather anomalous situation. For a good discussion of the problem of whether the multiplication process (a) can or (b) cannot be used at all, or (c) may be used as a "factor" in evaluating mineral bearing land, and citations to the various conflicting authorities, see *State v. Nunes,* 379 P. 2d 579 (Ore. 1963). The question has not previously been decided by this Court, and we are of the opinion that the record before us leaves the matter open because the appellant has not properly preserved the question on appeal." *Id.* at 229, 230.

Support for the dictum in *Creswell* is found in *Nichols* on *Eminent Domain* (3rd ed.) Vol. 4, § 13.22, pgs. 412, *et seq.*:

"* * * [T]he rule has been correlatively stated that the value of such mineral deposits cannot be separately determined independently of the land of which it is a part. It cannot be considered as so much potential merchandise to be evaluated as such. The land taken must be valued as land with the factor of mineral deposits given due consideration. In determining the just compensation to be paid to the owner it is not permissible to aggregate the value of the land and the value of the deposit. Thus, the value of the land as stone land suitable for quarrying—but not the value of the stone separate from the land—is a proper subject of consideration both by the witness and the jury in fixing the amount of just compensation to be awarded. The value of the land is not measured by such facts. The stone is a component part of

the land. However, while the profits, price or value of the minerals taken separately, may not be considered, yet the value, extent and quality of such minerals as exist upon the land may be considered. * * * All legitimate evidence tending to establish the value of the land with the minerals is permissible. This is not to say that such minerals are to be separately evaluated but that consideration may be given to the quantity of the mineral that can be extracted and to the value thereof purely as evidence for arriving at the value of the land. * * *."

To similar effect see also 1 *Orgel* on *Valuation Under Eminent Domain,* § 165.

After reading *Nichols* and *Orgel* one may well ask, are they not requiring the courts, the expert witnesses and the jury to adhere to a distinction that exists only in intellectual contemplation and dissolves when one views the issue in its real life dimensions. This would be something akin to Plato's man in the cave who, chained to the stake, knows only real objects by the shadows they cast on the wall in passing. *Orgel* uses picturesque language to describe his view of the frustration caused by the majority view, stating: "Evidently, the tribunal may be allowed to get a taste of the owner's juicy pie, and to look at it from a distance even though it may not be permitted to become confused by a measurement of its enticing dimensions."

We think we can extract the essence of what the eminent text writers are trying to say, but it is difficult to logically express it. This was recognized by the Court in *State v. Nunes,* 233 Ore. 547, 379 P. 2d 579 (1963), and that Court made a commendable effort to plow new ground in this area. However, we think what it came up with is simply a more sophisticated version of the multiplication method which in the final analysis is imbalanced by speculation. The Court in *Nunes* discounted the multiplication method as meaningless unless it was uti-

lized as a way of arriving at the new profit from the sale of the materials. However, the vital factor in this process is still a formula in which the quantity of mineral is multiplied by the existing unit price. The formula is also conditioned by further refinements which seek to take into consideration market demands, market fluctuations, and deduction of operating costs. At first glance, the capitalization method proposed in *Nunes* does seem to have something to recommend it; however, on closer inspection we think that it is vulnerable to the criticism that it requires the use of too many speculative factors which on balance tips the scale towards an exaggerated market value.

With the issue that was lacking in *Creswell* squarely before us, we think that Judge Mathias in the lower court was correct in instructing the jury that they should not use the multiplication method in arriving at their award. Following the same reasoning, we are of the opinion that the trial judge was also correct in excluding the evidence by which the expert witness sought to testify before the jury how he arrived at his evaluation of the mineral deposits by determining what was the unit value of the minerals in place and multiplying that value times the quantity. We think such testimony is not only highly speculative, but if a jury is to intelligently analyze it without accepting the gratuitous assumptions inherent in such testimony, it requires them to reach separate conclusions on a gallimaufry of collateral issues which are more apt to confuse than enlighten. We think the danger in such testimony was set forth with clarity in *U. S. Ex. Rel. TVA v. Indian Creek Marble Co.*, 40 F. Supp. 811 (D. Tenn. 1941), wherein the Court rejecting such testimony stated:

> "Fixing just compensation for land taken by multiplying the number of cubic feet or yards or tons by a given price per unit has met with almost uniform disapproval of the courts. This is true because such valuation involves all of

the unknown and uncertain elements which enter into the operation of the business of producing and marketing the product. It assumes not only the existence, but the continued existence of a stable demand at a stable price. It assumes a stable production cost and eliminates the risks all business men know attend the steps essential to the conduct of a manufacturing enterprise. It eliminates the possible competition of better materials of the same description and of the possible substitution of other and more desirable materials produced or possible of production by man's ingenuity, even to the extent of rendering the involved material unmarketable. It involves the assumption that human intelligence and business capacity are negligible elements in the successful conduct of business. It would require the numeration of every cause of business disaster to point out the fallacy of using this method of arriving at just compensation. No man of business experience would buy property on that theory of value.

Values fixed by witnesses on such a basis are practically worthless, and would not be accepted." *Id.* at 822.

We would add that in our opinion the use of the multiplication method would have undue attraction for the jury. They would tend to focus their attention on a pat formula proposed for arriving at just compensation to the exclusion of other important and less speculative evidence of fair market value.

The majority of courts allow the introduction of evidence as to the quantity and quality of the mineral deposit, taking exception only to attempts to show the overall value of the mineral deposits by attributing an in place unit value or other monetary price figure per unit. The recent Pennsylvania case, *Werner v. Commonwealth*, 432 Pa. 280, 247 A. 2d 444, 448 (1968), places the issue in proper perspective:

"The Commonwealth would have us include a fourth rule: not only may the condemnee not introduce evidence of the number of tons of minerals lost and then multiply that number by a dollar figure, he may not introduce evidence of the number of tons for any reason. The Commonwealth maintains that this is already the law in Pennsylvania and relies on four cases: *Searle, Balthaser, Sgarlot* and *Williams v. Commonwealth, Department of Highways,* 423 Pa. 219, 223 A. 2d 865 (1966). A close reading of these four cases reveals, however, that in each instance, the condemnee multiplied the number of tons by a dollar figure. Therefore, none of these cases answers the precise question before us — whether the condemnee can introduce evidence of the number of tons if he does not multiply that figure by some dollar amount. Our research has not uncovered any case in this Commonwealth dealing with this precise question.

The question has been decided in numerous other states, however. All of the cases cited to us in the briefs of both parties have held that such evidence is admissible. Sound logic dictates this result. The jury must place itself in the position of a potential purchaser of the tract in question. Snitzer, Pennsylvania Eminent Domain, § 603 (1965). Such a purchaser would certainly consider the existence of mineral deposits beneath the surface in arriving at a purchase price. * * *

We are not quarreling with the time-honored rule that the jury may not multiply the number of tons by some dollar figure in order to value the minerals separately. This is error for two reasons. First, the minerals may not be valued separately apart from the remainder of the tract. Second, it is impossible to determine how much a ton of sand and gravel will be worth

until it has been removed from the earth and processed for market. All we are saying is that a tract of land containing 500 tons of sand and gravel is much more valuable than a tract of land with five tons and the jury has the right to know more than that there is a sand and gravel deposit of unknown quantity below the surface."

See also *State v. Noble*, 305 P. 2d 495 (Utah 1957) ; *Reiter v. State Highway Comm.* 281 P. 2d 1080 (Kan. 1955) ; *St. Louis Belt & Terminal R. Co. v. Cartan Real Estate*, 103 S. W. 519 (Mo. 1907) ; *Searle v. Lackawanna and Bloomsburg R. R. Co.*, 33 Pa. 57 (1859) ; *United States v. 4.553 Acres of Land, Etc.*, 208 F. Supp. 127, 130 (S. D. Calif., 1962). The meaning which we extract from the cases representing the majority view is that, the expert witness may definitely take into consideration as one of the factors in reaching his evaluation of the land as a whole the quantity and quality of the minerals present, and the value which they give to the land considered as a whole. However, in making this appraisal he must not value the minerals separate and apart from the land or aggregate the value of the minerals and the value of the land. Furthermore, it is our view that the expert witness should not utilize the in place unit value, or any unit value of the mineral, multiplied by the quantity in order to arrive at the evaluation of the minerals, as we think the result thus obtained would be too speculative for the reasons which have been heretofore expressed in this opinion.

It is obvious that adherence to such a rule of evidence will present problems on both direct and cross-examination of the expert witness. In this conjunction it may prove necessary to take a portion of the testimony of such a witness out of the presence of the jury. This would be particularly true if one party seeks to satisfy itself that the expert witness did use the multiplication formula as the method of determining the value of the minerals,

when considering the presence of minerals as one of the factors in arriving at the fair market value of the land as a whole. However, the difficulty is not insurmountable. We think the trial judge can keep the testimony within permissible bounds without placing the witness in a straitjacket. The situation may also be aided by the use of cautionary instructions to the jury. *Werner v. Commonwealth, supra,* at 448. See also *Lustine v. State Roads Commission,* 217 Md. 274 at 279, 280, 142 A. 2d 566 (1958).

We also make the caveat that nothing which we have stated in this opinion is intended to prevent the capitalization of "royalty agreements," when such agreements provide for a minimum annual royalty.

Also, it should be kept in mind that minerals may be evaluated separate from the land in cases wherein there has been a severance of the surface rights from the mineral rights. See *United States v. 4.553 Acres of Land, Etc., supra;* however, it should be noted that in such cases the use of the multiplication method is still prohibited.

In the case at bar, even if Maryland were not a jurisdiction espousing the majority view excluding the multiplication method as a basis for determining the fair market value of property containing mineral deposits, there would still be little justification for employing or resorting to such a method because of the availability of comparable sales. The State produced witnesses who testified to at least nine comparable sales of sand and gravel quarry properties located within a few miles of the subject property in Prince George's and Montgomery Counties. These like the subject property were a part of the Patuxent formation. These sales ranged from about $3,-000 to $5,000 per acre and occurred between the years 1962 and 1965. The date of the present taking was February of 1967. These sales certainly presented evidence bearing greater weight on the question of fair market value than the speculative evidence generated by the multiplication method, even though such method be qualified

by the conditions placed upon it in *Nunes* and restricted to the purpose of providing a basis upon which capitalization of income could be made.

The State in its brief made much of the fact that a proper foundation was never laid for the introduction of the multiplication method. It contended that the exhibits proffered, which were submitted to show the value of the minerals in place, were so unsophisticated as to be legally insufficient in that they represented a commingling of vouchers, invoices and checks in payment of royalties and sales from a number of properties leased or operated by the Smiths. However, in view of the law of the case as we have stated it, we see no need to pursue the merits of the proffers.

We would also note that an evaluation of the subject properties based on the multiplication method (value of the unit in place times quantity) was actually admitted into evidence. Mr. Smith, who together with his wife owned the properties, testified that the damage done by the taking to the "Aitcheson" tract was $888,430. This figure could only have been arrived at by using the multiplication method. With regard to the "Hutchinson" tract, Mr. Smith also testified that the damages caused by the taking plus the cost of the construction of an access road amounted to $261,334. This figure also could only have been reached by employing the multiplication method, as the testimony of the expert witness Mr. Walcroft, which was stricken, was to the effect that the damage caused by the taking was $200,000 which figure he had broken down into $75,750 for the value of the land, $83,487 for the minerals and $40,850 for the cost of the road. He conceded that the multiplication method was utilized in arriving at his value for the minerals. Thus, even if the jury instructions were erroneous, it is difficult to see how they prejudiced the property owners' case.

On appeal the property owners pressed to a lesser degree the court's overruling of their objection to the testimony of the State's witness, Barry Ditto, with regard to comparable sales. Mr. Ditto was an employee of the

State Roads Commission. Although he laid claim to a Bachelor of Science Degree in Finance and an LLB. degree and had completed appraisal courses I and II at Johns Hopkins University and the American Institute of Real Estate Appraiser's course at the University of Virginia, he was not called to testify as an expert witness for the purpose of establishing fair market value. His sole purpose as a witness was to testify as to the market data gleaned from his investigations of the land records in the office of the Clerks of the Court in Prince George's and Montgomery Counties and also from inquiries made with the sellers and purchasers of sand and gravel quarry property. This Court has frequently said that the qualifications for a person to testify as an expert witness is usually left to the sound discretion of the trial court. *Stewart v. Baltimore City,* 250 Md. 569, 581, 244 A. 2d 231 (1968). We think that there was no abuse by the lower court of its discretion in allowing the witness Ditto to testify as to market data and that he had a competency in that field.

The property owners would also assign as error that portion of the court's instructions to the jury in Case No. 244, wherein it informed them that they could consider any enhancement in value to the property owner resulting from the granting of a right of way by the State Roads Commission of a right of ingress and egress to and from the subject property. Actually, we think the appellant has misinterpreted the instruction, because as we read it, it merely informed the jury that they could "consider as consequential damages, the value or cost to the property owner of providing the road facilities for the utilization of ingress or egress over this right of way to a public road as a measure of your damages resulting to this property in your award." We think the instruction was proper as there was testimony that the property owner contemplated the construction of an access road over the right of way provided by the State and the issue was raised that this cost should be an item of consequential damage. In any event, we do not intend to

labor this issue further for the simple reason that the record does not reveal that the property owners took any exception to this portion of the instruction. Maryland Rule 554 e.

In argument the State made a telling point that from the testimony a pattern appeared that where land was zoned rural residential, the sand and gravel operators found it worth their while to pay up to $5,000 per acre for the property in the Patuxent formation for quarry purposes; however, when the prices arose above that, they found it uneconomical to compete with real estate developers at the higher price per acre. In the instant case, there was testimony that the eventual highest and best use for the land was for real estate development, that the area where it was located was in a state of transition, and that the highest interim use was for sand and gravel deposits. It is quite likely that the logic of the State's argument was apparent to the jury.

In sum, the jury was instructed that in reaching the award of damages that they could "and must" consider the quantity and quality of the gravel in the land in relation to the total value of the property. A reading of the record persuades us that they did this and in so doing awarded just compensation to the property owners based on fair market value. Accordingly, the judgments should be affirmed.

*Judgments affirmed in both cases, appellants to pay costs.*